16-1585. Mr. Parker? Thank you, Your Honor.  Now, you reserved three minutes for rebuttal, correct? Correct, I did. OK. You may proceed. Thank you. Your Honor, in this case, the district court found that over 100 of Everlight's LED models infringed Nietzsche's patents. There is abundant evidence on the record, including in the district court's own opinion, that Everlight and Nietzsche are direct competitors. Yet the district court denied Nietzsche an injunction. You're competitors, but you're really not The competition between the two companies is not significant. At least, that's what I gather from the record. Judge, the district judge in this case applied a standard that he called meaningful competition, which may be the same as significant competition. I don't know that, because it's a new standard that's never been applied. But you didn't introduce any evidence of that competition. Market share, price erosion. We provided abundant direct evidence of direct competition between the parties. For example, in the court's opinion, there's discussion of the battle between Nietzsche and Everlight for the Lights of America sale. There's the battle between Nietzsche and America for the sale to Nietzsche's biggest US customer, General Electric. What the district court found in conclusions of Clause 61 and 62 on page 133 was that Nietzsche had not shown that, but for Everlight's competition, Nietzsche suffered past economic harm. That is a standard that this court has never applied. This court has said that direct competition is evidence of irreparable harm. It's the direct competition standard that this court has looked to. The court has never applied a meaningful, quote, meaningful competition standard, which requires a patent owner to show a but-for economic loss in the past. By contrast- But direct competition alone is not sufficient, is it? I'm sorry? Is direct competition alone, in your view, sufficient under the eBay standard? The court has held, and the answer to your question, Your Honor, is the court has held that direct competition between the patent owner and the infringer is important evidence of irreparable harm. It may not be sufficient, because the court has to analyze all four of the eBay factors. But I submit that this court's guidance is to the district courts to look to direct competition and not to elevate that standard to require that the parties show past economic harm. And this is directly consistent with eBay, for example, where the- I'm still a little confused. Even if there's direct competition, don't you have to show that money damages can't suffice to remedy that? No, Your Honor, the standard- Isn't that the termination you're looking at, multiple different factors, and then you have to balance those factors, right? That's correct. But what the result of the district court's opinion- there are two results of the district court's opinion, one broad and one specific to this case. The broad result is, first of all, there's no injunctive remedy for infringement by importation or offer for sale. And in fact, what the district court is effectively saying is that a patent owner, even facing competition for the biggest customer like GE, has to wait until they lose a threshold amount of sales before they're entitled to an injunction. The specific problem, and the reason why that's a particular problem in this case- The problem I'm having with your argument right now is that we're reviewing this for an abuse of discretion, and it's based on the district court's analysis of a totality of facts. It's not making a legal pronouncement that is going to apply to every case. And so I am having a hard time understanding how you're turning all these fact findings and analysis and balancing that the district court did, how you're turning it into a legal determination that's going to apply for every case in the future. You're right, Your Honor. You're absolutely right. This is an abuse of discretion standard. But this court has held, and it must be, that the district court's discretion is not untethered. That there must be guidelines. The eBay guidelines, the eBay factors, and the application of the eBay factors must have guidelines so that the parties know what to argue and to frame the issues for the district court to exercise its discretion in an appropriate way. This court has held in, for example, the MITEI case, unfortunately not a published opinion, but this court has held, it has never required a showing of past damages. This court has also held in another case that the patent owner should not be penalized for their ability to maintain their market share in the face of competition and then be deprived of an injunction. And that's very important in this case in particular, Your Honor, because we're dealing with LEDs. And one important aspect of LEDs is that they last for 5, 10, 15 years. Once NETEA loses the opportunity to put its LEDs into those GE light bulbs, by the time those light bulbs expire, the patents in this case may well have expired as well. So for NETEA to wait and lose a sale, I'm not even talking about the design win aspect of this case, which we've discussed in our briefs. Just the nature of the technology is that if you lose a sale, this is It seems to me, or obviously I was at the court when you made these arguments, but it seems to me I hear an echo here. And you're making attorney arguments, but there's no data here. You're having a difficulty making it even pass that they're a competitor. Your Honor, let me approach it this way. There's no evidence of price erosion, lost sales. You weren't able to show even the amount of sales that you've lost to Everlight. The ones that were brought up were fairly small. They may be a competitor in that they're in the same field, they're a business in the same market. But competitor means that you're toe to toe. And Your Honor, with respect to Lights of America, with respect to GE, and I can cite to numerous other documents in the record where Everlight, for example, has described its, quote, attack plans for targeting Nietzsche of customers. But so what? A little business wants to attack the big business. Your Honor, I respectfully disagree. Everlight is the eighth largest LED manufacturer in the world. At the time of trial, they had 40% annual growth. This is not a situation in which Everlight is a pipsqueak. This is a situation in which Nietzsche acted with alacrity. It filed suit, this lawsuit, at the time of the GE battle that the district court described in its opinion. And it then- Is Nietzsche's market base retail? Is it to US customers? Or is it to distributors? Both Nietzsche and Everlight sell directly to companies that incorporate the LEDs into their- Yes, but most of Everlight's customers are distributors. The finding was that it's about 50-50. But even those distributors are selling infringing Everlight products to companies that are part of Nietzsche's potential market. What I hear from the court is the possibility, a possible concern that this is kind of a standardless situation. But it's not, I submit. The court in UWT Grant, the Supreme Court case, said that the question is not whether there's been past harm, but that an injunction is a forward-looking remedy. And the question is where there's a cognizable danger of recurrent violations. In the Accorda case, this court said that an injunction is to prevent a defendant's planned, non-speculative, harmful conduct before it occurs. That's why Nietzsche brought this suit. And we can, again, there are documents in the record  That may be so, what you're saying. But when you're talking about harmful conduct, the law is clear. It's called irreparable harm. And there's a number of standards that need to be met. It's not easy to get a permanent injunction, correct? So you have a high hurdle. The district court said you didn't pass a hurdle for a whole host of reasons. Well, I did. Another one is that you do have a significant number of licenses out in the market. Let me, if I may, Your Honor, two aspects to that comment. I will finish up on the competition issue, and then I'll shift over to the license issue. In eBay, the Supreme Court said, let's apply standard principles of equity in patent cases. Standard principle of equity, if I say to the court, my neighbor is about to chop down my apple tree, the court doesn't say, how far has the blade gone in? Has he made the first chop yet? Has he made the second chop yet? The court enjoins the harm before it occurs. Same situation here. If Everlight gets into GE, Lights of America, Cooper, Osram, all the other companies that are Nietzsche's customers, where Everlight has engaged in direct competition, then the blade is in the trunk of the tree, and there's no reversing that. Again, not only because of the- Your argument, I understand what your argument is. But I think what I read the district court to have held is that that is not likely. That is not likely to happen based on the evidence that it has analyzed before. I read the district court's opinion literally, and I specifically read conclusions of law 61 and 62, where the district court summarized what the direct competition between Nietzsche and Everlight in the Lights of America and GE situations, of which there are two of many. And what it said is, Nietzsche did not show past harm to a but-for level of causation. Again, a patent- No, no. 61, the court said, plaintiff admitted and made no attempt to establish the relevant market share for Nietzsche Corporation. And it seems to me that unless you establish relevant market share, your arguments about the ax and even how deep the ax is, it's difficult to undertake in a relevant fashion. Well, I'm referring, Your Honor, to the last sentence in each paragraph. But I directed your attention to this sentence. Oh, you're absolutely right, Your Honor, because we had- You made no attempt to show market share. We had shown- no, we didn't. There's no dispute that Nietzsche is the number one company in the world. What we had said was- In sales, but what's the market? How much of the market share do you have, a total market? I don't have those data with me right now, Your Honor. But if you don't have the data, how does the district court to know what losses you're going to sustain in the future? Because the evidence was clear and unrebutted. And I'll just take the one example again. The general electorate was Nietzsche's largest US customer, a vital US customer. The district court describes direct competition. And then at the end of paragraph 62, says that doesn't count towards an injunction because Nietzsche did not show price erosion to a but-for level of causation. Again, so the district court held, for the first time, there is no precedent for this in any decision of this court, certainly, where a patent owner has been put to the burden of showing past harm by but-for causation. And I repeat once again, the effect of this is to say there is no injunction under the statute for importation or offer for sale of infringing products. OK, you're in rebuttal time. May I say something? Go ahead. I didn't get a chance to talk about the license aspect of your question. Make it quick. One minute. First of all, I think the district judge started off with an arithmetic error. He overstated the extent of Nietzsche's licensing by 50%. That's undisputed. So it's 27%, right? He said 41%. The actual number, which the parties agree based on the evidence, is 27%. Each of those licenses is a technology cross-license. If Nietzsche doesn't get an injunction in this case, actually, what it will have to do now, and what Nietzsche is willing to do, is to file another lawsuit. But in the ordinary course, if a patent owner doesn't get an injunction in a case like this, its only recourse, its only remedy, is effectively a compulsory license with a royalty. That's devastating in the LED industry, for the reasons I mentioned. LEDs last so long that you don't get a chance to recapture that business with your patented technology. Number two, Nietzsche has never licensed its technologies for royalty. Never licensed its technologies for royalties alone. Its licenses are technology. Each of those licenses is a technology cross-license. And most of them are royalty-free. And even where there are royalties, they're in specific circumstances and, essentially, not important. Your Honor, thank you for giving me some extra time. I know I ate up my time. That's all right. Thank you very much. Thank you. Mr. Schellinger, did I say that correctly? Yes, you did, Your Honor. All right. Good morning, and may it please the court. I plan to focus first on non-infringement and invalidity issues relating to the 250 patent, and then respond to the court's discretionary refusal to award a permanent injunction. I intend to rely on the briefs for the 589 and 870 patents. You're saving two minutes for your cross-appeal. Is that correct? Yes, Your Honor. And you're devoting 13 minutes to rebuttal here. Well, I plan to use the time both on the merits of my cross-appeal case in chief and also to respond to counsel's arguments on the injunction. All right. But I'm going to limit my argument to just the 250 patents and just to some of the issues. The first, the district court committed legal error in rejecting our constructive claim of LEED. What is the basis for LEEDing? What is the basis for adding the requirement that the LEED must go have the electricity conduct from the outside in? What is the basis for that? Where is that in the spec or the prosecution history? Let me start with the spec. And what the spec says is that the light emitting element 10 is electrically connected with the LEEDs through wires 50. Now, the spec doesn't disclose a battery in these. It doesn't disclose any self-powering. So one would expect a person of ordinary skill in the art would understand and expect that the power is going to come from an external source. And indeed, that's consistent with stipulation 87, which is at A2107. The various, quote, the various components within the LEED package permit several functions, including one, supplying electrical input. Is that describing the patent stipulation? Or is it describing the accused product? What is it describing? It's a general stipulation about an LEED package, Your Honor. And it dovetails with the patent because an LEED package by itself is useless. You can't excite the LEED chip without putting power on it. So if without a way to connect the LEED to a source of power, you've got a very small boat anchor. And that's why the LEED, that's why everyone admitted that the witnesses from both sides agreed that the chips were connected, our chips were connected to an external source. And if LEED has the meaning only ascribed to it by the district court, which is to conduct a portion that conducts electricity, there are wires inside the LEED package. There is a chip itself. They also conduct electricity. That's too broad a construction. And it's so broad as to be effectively meaningless. But that's the purpose of a LEED, correct? The purpose of the LEED is to conduct electricity from an external source to excite the LED chip. That's where it comes from. But the purpose of the LEED is to conduct electricity, but not that broadly. It actually, the LEED connects the LED to the external source on one end, and then through the wire to the chip to excite it. And that is the proper function of a LEED. Now, the district court relied on the common understanding of the word and the way the word was used in the specification and didn't read this additional requirement in. And your point is, I guess, that with respect to LEDs in particular, everybody, one of our lawyers would need to know, would understand that a LEED has that additional requirement? That's correct, Your Honor. And that's why I point to Stipulation 87. And let me also mention, in connection with our products, Stipulation 23 is agreement that our chips are surface-mounted. So the bottoms sit on something that connects. Well, we can't consider that with respect to claim construction. It feels to me as if that would, you're conflating infringement with claim construction. When we start looking at your accused device to determine how to interpret the claim, we certainly are conflating the two categories, right? Your Honor, I don't know that I've conflated them. I'm using extrinsic evidence. But let me put 23 to a side. 91 doesn't talk about any particular device. It's a general stipulation about how LEDs function generally. And that's consistent with Your Honor's question about what a person of ordinary skill in the art would understand. The reason this construction dispute is important is because Nachia's expert took the judge's construction, which was the portion that conducts electricity, did a laboratory experiment where he had someone put a probe on these tie bar   and got the chip to light up and said, see, it conducts electricity. The problem with that is that's not how it works in the real world, that there's no dispute that Everlight doesn't intend its devices to be used that way. There's no dispute that the tie bar remnants actually serve any purpose in the LED after the chips have been cut into single devices, after singulation. The Everlight's expert testified without dispute, without disagreement, that those tie bar remnants during operation don't conduct electricity. And he explained why. And on page six of our reply brief, we have a figure of the device. And if you look at the right-hand figure on page six of the reply brief, witnesses from both sides were consistent that the large black portions on the bottom surface are the leads that provide the electrical connection between an external power source and the LED chip. So what in the specification would I find something that teaches me that leads references to the conduction of electricity outside of the device? Your Honor, those words are not in the specification of the 250 patent. But what I submit to the court is I'm sorry. Where would a procedure then? Why would a procedure understand that a lead is limited to conduct electricity outside of the device? Because the 250 patent doesn't describe in the specification a power source anywhere, not within the four corners of the device. And it's got an LED chip, the purpose of which is to light up when it gets electricity. And so one of ordinary school in the art would understand from looking that if you have a device, there's no internal power source, the lead is intended to conduct electricity to excite the chip, the power has to come from outside. And that, again, is consistent with stipulation 87. So your construction appears to be prompting us to find a use limitation. Because you say the specification doesn't require it, but that the use does. It's not so much a use limitation as a use limitation. You're arguing that it is a use limitation. You said that that's not how these devices are used in the real world. And I apologize. Let me separate my two points. For infringement, the question is, and the court has held that, an experiment sort of out of the ordinary, where that's not how a device is ordinarily used, doesn't prove infringement. And that's the point of. Claims are method claims, right? No, they're not. The claims in the 250PAT, a method of manufacture and light emitting device? Independent claim one is a method claim. Independent claim 17 is a device claim, Your Honor. And so in use, the way they proved infringement was this laboratory experiment that there's no evidence it's ever actually been done in the real world. No evidence it was done by any actual user. And where our expert says, in fact, if you ran this in its ordinary way, the high bar remnant would not carry electricity, would not be conducting. It goes straight through. And so I guess the point of, I don't think it's a use. I think it's part of what a lead is. A lead is something that conducts from point A to point B. And here, where there's no internal power source, that point B is somewhere outside. The claim doesn't, it doesn't expressly talk about the power source, right? The claims? Neither the claim nor the specification describes a power source. That's correct. Could you address the injunction issue? I can, Your Honor. Unless there's something else you want. And you have a number of other issues. Let me just say briefly, I do want to address invalidity. And I'll be brief, and then I'll address the injunction. The district court committed clear error in finding no motivation to combine. Again, there's a finding of fact 23, which is based on stipulation 86, is the field relevant to the inventions, field singular, relevant to the inventions of the patents in suit, is light emitting diode and semiconductor technology, including packaging. The field covers both LED and semiconductor technology. That was the judge's finding. That was based on a stipulation. The patents, the three patents themselves, interchangeably use the phrase semiconductors and LEDs. The parties also stipulated, stipulation 90, that LEDs are semiconductor-based devices. The plaintiff's exhibit 1114, and we quote it in the brief, is a reference book written for LED and IC packaging because, quote, knowledge learned in the past 20 years in IC packaging can be applied to LED packaging. Again, very analogous, Your Honor, as in unwired, I believe. With respect to the finding of commercial success, very briefly, appendix 10111, defendant's exhibit 110 is a NICHEA technical document about the 757 products. The first subheading says, proprietary thermoset composite outperforms plastic and ceramic. Same document, same page. Next heading, NICHEA reinvents LED package design with proprietary thermoset composite. Then there's text that embellishes that. The district court relied on a third party publication, one page, for industry praise. It's a 2013 document, five years after the priority date. And it says, NICHEA was the first to use EMC lead frame material, the proprietary material. And the company's 757 series became a hot seller in 2013, end quote. That's 3325. Your Honor, turning to the injunction, the district court didn't create a new standard with meaningful competition. Competition, as Your Honor asked or said, is the beginning of an analysis. It's not the end point. And what the district court did is go through NICHEA's evidence of competition. There are findings of fact between 412 and 433. All dealing with these issues, NICHEA hasn't challenged them. Let me point to just two. Finding the fact 416. There is no overlap between NICHEA and Everlight with respect to NICHEA's top 20 customers in the US for the accused products. Finding 418. While NICHEA's internal documents show that NICHEA America had 516 US sales opportunities, which it claimed were in competition with Everlight, Everlight is identified in only three of such 516 sales opportunities, reflecting potential sales of $50,000. OK. Counselor, you're out of time, and we thank you. Thank you, Your Honor. Your Honor, I've used up all my time. Two minutes? Yeah, I'm going to restore you back to three minutes. Oh, thank you, Your Honor. I will try to be quick. I have just two points I would like to make. Regarding the 250 path, regarding the claim construction of the term lead, the claim construction was not made willy-nilly. It was made in the context of the claim in which the word appears. In finding the fact 35, the court listed the claim elements, and the word lead appears in element 1D. And what it says is, as part of the manufacturing process, you have a lead frame which has mold on it, molding, resin molding. It's a molded lead frame. And the lead is the component of the resin package that results when that molded lead frame is singulated, that is cut into individual packages. So in the context of what the claim is telling us, which is a lead is the portion of the lead frame that remains in the resin package after singulation, it is, in fact, the component that conducts electricity. It was perfectly appropriate for the court to say the word lead is used in the claim as that part of the resin package is the part of the resin package that conducts electricity. That was in the context of the method of manufacturing claim, not in the context of claim 17, which I understand is an apparatus claim. That's right. But the court found, and there's no dispute, that the term lead is used. He found, that is, it's in his memorandum on claim construction, that the term lead is used the same in all the claims. So I think the judge was correct there. I would just ask the court, in connection with the term lead, if you look at Everlight's gray brief on page 6, there's an X-ray of a lead. It shows the extending, whatever light calls tie bars. The district court found, as a matter of fact, and there's no dispute, that that is all one component. That's all connected. They're not separate pieces. If you turn back to page 5, you can see the side surface of the lead that we're talking about on the side. It's those brown squares. Then turn to page 10 of their brief, which is figure 1 of the 250 patent. Figure 1 of the 250 patent shows, on the side, a square. And it's got element 22 pointing to that square. And it says, that is a lead. So if you look at page 5 of the brief, and you look at those squares on the side surface of the package, and you look at figure 1 of the 250 patent, element 22, it's the same square on the side of the package. So I think the finding there was absolutely correct. Regarding the, but also let me just say that it doesn't matter because the district court made finding of fact 61, where he said, the piece of metal exposed at the side of the package is the same piece of metal that conducts power from an external power source to a light emitting element. So in that respect, even under their construction, under the court's finding of fact, the infringement findings would still stand. I won't address the validity issue. We'll rely on our briefs for that. OK, we thank you very much. Thank you, Your Honor. If I may just very briefly, Your Honor, the court never actually said it's all one thing. What the court said is that the tie bar remnants are part of the same metal as the leads. And there's no dispute about that. We're dealing with different lead frame structures. The tie bars, prior in the course of the manufacturing process, connect the one lead to an adjacent lead. That's the structure we use. The Nachea patent, the 250 patent, shows a very different structure for supporting them. When you go through the process and you singularly cut the chip, the tie bar has ceased serving any function. And this is where the question of it's still part of the same metal, but not only doesn't it do anything, but the unrebutted evidence from Dr. Bretschneider is that in operation, it doesn't conduct electricity. That's at 2563. And so it's a remnant. It's the equivalent of an appendix, which doesn't do anything. And so but for the expanse of construction, nobody would be saying, which gave Dr. Schubert, the other side's expert, a chance to put those probes on, there would be no proof. There would be no argument whatsoever. So I believe the construction has caused harmful error. If the court has no questions, I'll sit down. OK, thank you very much. Thank you.